## GUARANTY TRUST CO. OF NEW YORK v. WEST VIRGINIA TURNPIKE COMMISSION.

### No. 1331.

United States District Court
S. D. West Virginia, Charleston Division.
Nov. 14, 1952.

186 F.2d 382; Jones v. U. S., 5 Cir., 106 F.2d 888.

288

Jackson, Kelly, Morrison & Moxley, Robert G. Kelly and Thomas B. Jackson, all of Charleston, W. Va., Davis, Polk, Wardwell, Sunderland & Kiendl and Theodore Kiendl, all of New York City, for plaintiff.

Lee M. Kenna, General Counsel, Spilman, Thomas & Battle, Robert S. Spilman and Hawthorne D. Battle, Special Counsel, all of Charleston, W. Va., and Mitchell & Pershing and John Pershing, all of New York City, for defendant West Virginia Turnpike Commission.

John G. Fox, Atty. Gen., State of West Virginia, pro se.

MOORE, Chief Judge.

Plaintiff brings this action under the provisions of U.S.C., Title 28 §§ 2201 and 2202, the Declaratory Judgment Act, seeking a declaration of the rights of the parties with respect to certain turnpike projects and the revenue bonds issued and sold in connection therewith; the Attorney General of West Virginia having rendered an official opinion that the Turnpike Commission exceeded its statutory powers in authorizing the projects; and the Governor of West Virginia having thereupon requested the Turnpike Commission to comply with the Attorney General's opinion as a condition precedent to going forward with the work of building a turnpike. Plaintiff also prays for affirmative relief.

Jurisdiction is claimed on the basis of diversity of citizenship. Before proceeding to a consideration of the merits of plaintiff's action, the following jurisdictional questions must be answered:

1. Is there an actual controversy between the parties?

2. Is there diversity of citizenship?

The basis for answers to these questions, as well as a determination of the case on its merits, if it is found to be maintainable in this court, must be found in the facts of the case, which are as follows:

The Legislature of West Virginia, at its 1947 session, enacted a law providing for the appointment of a turnpike commission, with power to construct turnpikes by means of the issuance and sale of revenue bonds, to be paid off from the proceeds of tolls exclusively. The title and pertinent provisions of the Act are:

"An Act to facilitate vehicular traffic in the state of West Virginia by providing for the construction, maintenance, repair and operation of turnpike projects; creating the West Virginia turnpike commission and defining its powers and duties; providing for financing the construction of such projects by the issuance of turnpike revenue bonds of the state, payable solely from tolls and other revenues; and providing for the collection of tolls and other revenues to pay the cost of maintenance, repair and operation of such projects and to pay such bonds and the interest thereon." Title of Act.

"Constructing and Financing Turnpike Projects.—In order to remove the present handicaps and hazards on the congested highways in the state of West Virginia, to facilitate vehicular traffic throughout the state, to promote the agricultural and industrial development of the state, and to provide for the construction of modern express highways embodying every known

safety device including center division, ample shoulder widths, longsight distances, the by-passing of cities, multiple lanes in each direction and grade separations at all intersections with other highways and railroads, the West Virginia turnpike commission (hereinafter created) is hereby authorized and empowered to construct, maintain, repair and operate turnpike projects (as hereinafter defined) at such locations as shall be approved by the state road commission, and to issue turnpike revenue bonds of the state of West Virginia, payable solely from revenues, to pay the cost of such projects." Acts of the Leg. of W.Va.1947, c. 139, § 1.

"Definitions.— * * * The word 'project' or the words 'turnpike project' shall mean any express highway or turnpike which the commission may at any time determine to construct under the provisions of this act, and shall embrace all bridges, tunnels, overpasses, underpasses, interchanges, entrance plazas, approaches, toll houses, service stations, and administration, storage and other buildings which the commission may deem necessary for the operation of the project, together with all property, rights, easements and interests which may be acquired by the commission for the construction or the operation of the project." § 4(b).

"General Grant of Powers.—The commission is hereby authorized and empowered:

* * * * * *

"To construct, maintain, repair and operate turnpike projects as hereinabove defined at such locations within in the state as may be determined by the commission; * * *." § 5(e).

"To issue turnpike revenue bonds of the state of West Virginia, payable solely from revenues, for the purpose of paying all or any part of the cost of any one or more turnpike projects;" * * *. § 5(f).

"Act Liberally Construed; Constitutional Construction; Inconsistent Acts Repealed.—This act, being necessary for the welfare of the state and its inhabitants, shall be liberally construed to effect the purposes thereof." § 20.

The Act sets out in detail the procedure to be followed by the Turnpike Commission in the performance of its duties and the exercise of its powers under the Act. It is provided that the Commission may sue and be sued; that it is constituted an agency of the State, and that its powers as exercised under the Act shall be deemed an essential governmental function of the State; it is authorized to condemn or purchase property and take title thereto in the name of the State of West Virginia. The State assumes no liability whatsoever, either for paying any of the expenses of the organization and maintenance of the Commission, or liquidating any part of the principal or interest of any of the revenue bonds issued by it, or any other direct or consequential liability. The members of the Commission serve without pay. It is noted here that there is a provision of this Act which permits the State Road Commission (the department of the State government which has supervision and control of the State Road system) to advance to the Turnpike Commission moneys needed to conduct preliminary surveys and engineering studies, as well as to contribute the services of the Road Commission's personnel in this connection; but the question of the constitutionality of this provision having been submitted to the Attorney General of the State of West Virginia, and he having rendered an opinion that it is unconstitutional, the Turnpike Commission has accepted and acted upon the Attorney General's opinion in this respect; and I assume its unconstitutionality for the purposes of this opinion. The Act gives to the Trustee under the trust agreement, which is provided for in detail by other sections of the Act, the right to maintain an action to protect any rights conferred by the Act, or under other laws of the State, or under the trust agreement, or the resolution authorizing the issuance of the bonds; and provides specifically that the Trustee may compel performance of all duties required by the Act, the trust agreement, or the res-

290

olution authorizing the issuance of the bonds. The Turnpike Commisson is exempted from the payment of any State taxes on any of the property acquired or used under the Act; and the revenue bonds and the income therefrom are also made tax free. When the bonds are fully paid with interest, the toll charges are to be discontinued and the turnpike, for the construction of which the bonds were issued, if in good repair, is to become part of the State Road system.

The provisions of the Act authorize the Commission "to provide by resolution, at one time or from time to time, for the issuance of turnpike revenue bonds of the state for the purpose of paying all or any part of the cost of any one or more turnpike projects"; and there is a provision that the Commission may issue refunding bonds for the purpose of refunding outstanding bonds, " * * * and, if deemed advisable by the commission, for the additional purpose of constructing improvements, extensions or enlargements of the turnpike project or projects in connection with which the bonds to be refunded shall have been issued."

The West Virginia Turnpike Commission was duly constituted by appointments made by the Governor, in accordance with the Act. The record is silent as to its early activities, but it appears that on February 1, 1950, it was considering the matter of undertaking to locate and build a turnpike, for on that day the Attorney General of West Virginia was asked for an opinion as to whether or not the State Road Commission could advance funds to the Turnpike Commission for preliminary surveys and traffic studies, and was told by the Attorney General, as already stated, that the provisions of the Act permitting such advances were unconstitutional. The Commission made other efforts to secure funds for these purposes, and succeeded in procuring underwriters in the persons of certain New York firms, who agreed to pay the preliminary expenses, with the understanding that they would be permitted to purchase the bonds. Thereafter approximately one year was devoted to making traffic studies, engineering estimates, etc.

The studies and estimates resulted in a determination by the Commission (1) that a north-south turnpike would best serve the public interest; (2) that a project for the construction of such a turnpike between the Virginia state line, south of Princeton, West Virginia, and a point near Charleston, West Virginia, on U. S. Route 60, could be financed by revenue bonds; but that (3) because of the mountainous terrain to be encountered on the projected route and the relatively light volume of traffic to be expected during the early years of operation, it would be impossible to finance a turnpike comprising initially four lanes of roadway. Therefore, the Commission further determined by resolution that it would build the proposed turnpike in stages. It laid out a project from U. S. Route 60 near Charleston to the City of Princeton, West Virginia, consisting of a four-lane highway, and called this "Project A." It laid out a connecting project from Princeton to the Virginia state line, consisting of a four-lane highway, and called this "Project B." Project A is about eighty-eight miles in length and Project B is about ten miles in length. The Commission then resolved that it would finance and build Project A, omitting therefrom for the present the construction of two lanes of the highway, as well as the center division; this resulting, of course, in the proposed construction now of a two-lane highway eighty-eight miles long. At a later time Project B is to be financed and built, likewise omitting initially all but two lanes. A final financing is to be undertaken to complete Projects A and B by adding the two lanes and center division omitted from the initial construction.

The Commission issued and sold $96,000,000 face value of revenue bonds to pay for the construction of the initial turnpike (that is, the two-lane highway eighty-eight miles long). These bonds are bonds of the State of West Virginia, signed by the Governor, but payable solely from revenues of the initial turnpike project, and containing a statement that "All acts, conditions and things required by the Constitution and laws of the State of West Virginia, and the rules and regulations of the Commission to hap-

pen, exist and be performed precedent to and in the issuance of this bond and the execution of the Agreement have happened, exist and have been performed as so required." Plaintiff is the trustee named in the trust agreement securing the bonds. The bonds and trust agreement were dated March 1, 1952. The bonds bear interest at 3¾%, payable semi-annually, and were sold for $91,590,000.

At some time prior to September 8, 1952, the Governor of West Virginia requested a report from the Turnpike Commission concerning its actions. In response to that request the Commission, on September 8, made such report, in which it undertook to explain its actions generally, and in particular why it had resolved to build the turnpike by stages. Upon receipt of this report, the Governor asked for an opinion of the Attorney General concerning the legality of the Commission's acts. On September 10, 1952, the Attorney General submitted to the Governor his opinion in writing, to the effect that the plan of operation of the West Virginia Turnpike Commission is not in compliance with the enabling act; giving as his principal reason that the reference in Section 1 of the Act to four-lane highways with center division limited the Commission's powers to the extent that it could not lawfully construct any other type of highway; and that though construction of a four-lane highway in successive stages may be lawfully undertaken by the Commission if the attainment of the statutory standard is definite and certain, such is not the case, in his opinion, under the terms of the Commission's plan. The Governor then wrote the chairman of the Turnpike Commission a letter, containing the following so-called "directive:"

"This letter is a formal request from the Governor to the West Virginia Turnpike Commission to immediately take necessary steps to get in compliance with the act, as interpreted by the Attorney General. If the Commission cannot comply with the Statute as so interpreted, the case must be submitted to the Supreme Court for a decision therein."

Upon receipt of the Governor's letter, the Commission immediately ceased its operations. At that time it had expended in the purchase of rights-of-way, employment of engineers and attorneys, and for other expenses incidental to the beginning of actual construction, several hundred thousand dollars, and had contracted for approximately $15,000,000 in additional items of cost. Ground had actually been broken to begin the grading of the roadway. Upon cessation of the work the Commission retained only such employees as were necessary to hold the organization together.

The Commission made an effort to conform to the Governor's request that it "get in compliance" with the Attorney General's opinion. This effort was based apparently on that portion of the opinion which speaks of uncertainty and indefiniteness of attainment with reference to the four-lane highway. The Commission secured from experts in that field estimates of the volume of traffic which might be expected to flow over the turnpike in its several stages. These estimates led to the conclusion that complete dualization of the entire Project A and Project B could be accomplished in the year 1966 if a connecting turnpike is constructed in Virginia (as is now being considered); and that in the absence of a connecting turnpike in Virginia, it could be accomplished in 1969. It is estimated that the two-lane highway already financed will, if it is built, go into use in 1954.

These conclusions were communicated to the Governor, and he was requested to seek some modification of the Attorney General's opinion on the basis thereof; but at this juncture the present action was started by the Trustee. Its stated purposes are to obtain a declaration and determination that the plans of the Commission, the trust agreement and the bonds are all in compliance with the Act; to have the court direct that the status quo be maintained; and upon a determination of legality of the proceedings in all respects, that the court direct the Commission to proceed with the construction of the turnpike; or in the alternative, if the decision of the court should be that the proceedings were invalid,

that a receivership be instituted, and the funds held by the Trustee administered for the benefit of the bondholders and any other persons interested.

The West Virginia Turnpike Commission, having ceased its operations upon receipt of the Governor's letter, is unwilling to proceed further without the protection of a decree from a court of competent jurisdiction delineating its rights and powers under the provisions of the Act. Thus the work is at a standstill, and it is probable that an "event of default" may have occurred or be about to occur in breach of a condition of the trust agreement; i. e., the discontinuance of construction of the initial turnpike.

Both the Trustee and the Commission are in agreement in arguing that the Commission's actions have been in all respects legal and in accordance with the provisions of the Act. Thus on the surface it may appear that there is no controversy. However, the Commission, though maintaining that it has the right to go ahead with the work, refuses to do so because of the Governor's "directive." The Trustee, as the representative of the bondholders, undoubtedly has the right, if the Commission has acted within its powers, to insist that the Commission proceed to build the turnpike.

■ Thus, there does exist an actual controversy between the plaintiff, Guaranty Trust Company of New York, and the defendant West Virginia Turnpike Commission.

I am also of opinion that there is diversity of citizenship between plaintiff and the defendant Turnpike Commission.

■■ This is not an action against the State of West Virginia. If it were the court would clearly be without jurisdiction to entertain it. The Eleventh Amendment to the Constitution of the United States provides:

"The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

And the constitution of the State of West Virginia, Art. 6, Sec. 35, also prohibits any suit against that state in the following words:

"The State of West Virginia shall never be made defendant in any court of law or equity, except the State of West Virginia, including any subdivision thereof, or any municipality therein, or any officer, agent, or employee thereof, may be made defendant in any garnishment or attachment proceeding, as garnishee or suggestee."

This prohibition in the constitution of West Virginia has been uniformly held to be absolute; that is, it cannot be waived by consent. See Hamill v. Koontz, W.Va., 1950, 59 S.E.2d 879; Stewart v. State Road Commission of West Virginia, 1936, 117 W.Va. 352, 185 S.E. 567.

It is true that the act creating the Turnpike Commission contains the statement that it is constituted an agency of the State, and that the exercise of its powers shall be deemed and held to be an essential governmental function of the State. But the same was true of the Pennsylvania Turnpike Commission; yet it was held in the case of Hunkin-Conkey Construction Co. v. Pennsylvania Turnpike Commission, D. C.Pa., 34 F.Supp. 26, that such a statement by the Legislature is not conclusive upon a federal court, but that the nature and attributes of the Commission should be examined and appraised in order to determine its true character. This principle was followed and approved in the case of Darby v. L. G. De Felice & Son, D.C.Pa., 94 F. Supp. 535. I agree with the reasoning of these two cases. See also Louisiana Highway Commission v. Farnsworth, 5 Cir., 74 F.2d 910; Board of Levee Commissioners v. Hulse, D.C.La., 17 F.2d 785. The West Virginia Turnpike Commission was given no power to incur any liability on behalf of the State. No funds of the State are used by the Commission for any purpose. The bonds are not a pledge of the faith and credit of the State, but are payable exclusively from revenue produced from the operation of the turnpike. The Commission makes its own contracts and employs and fixes the compensation of its

own personnel. The only noticeable differences between the West Virginia Act and that of Pennsylvania, 36 P.S. § 652a et seq., creating the respective turnpike commissions are, that in the West Virginia act the Commission is termed an "agency" of the state and in Pennsylvania it is named as an "instrumentality of the Commonwealth;" the West Virginia act requires the Commission to take title to lands in the name of the state, whereas, the Pennsylvania act permits the Commission to take title in its own name; and in the West Virginia act the Commission was created for the purpose of constructing turnpikes generally, and therefore is not to go out of existence when the bonds issued for the present projects have been paid; whereas, the Pennsylvania act provided for the dissolution of the Commission on retirement of the turnpike revenue bonds. In Pennsylvania the members of the Commission are paid salaries out of revenues derived from tolls; in West Virginia they serve without compensation. These differences are, in my opinion, unsubstantial and have no bearing on the question presented. By the West Virginia act, as by the Pennsylvania act, the Legislature clearly intended to divorce the Turnpike Commission as fully as possible from any identity with the State, while giving it all the functions which are necessary and essential to the accomplishment of its purposes. Fowler v. California Toll-Bridge Authority, 9 Cir., 128 F.2d 549, and Kansas City Bridge Co. v. Alabama State Bridge Corp., 5 Cir., 59 F.2d 48, among the cases holding similar appointive boards or commissions to be arms of the state and therefore immune from suit, are found upon examination to turn upon circumstances of state control, function, power or interest which are not present among the attributes of the West Virginia Turnpike Commission.

All the members of the Turnpike Commission are citizens of West Virginia, and for purposes of federal jurisdiction the Commission has the status of a citizen of the state of which its members are citizens. See Thomas v. Board of Trustees, 195 U.S. 207, 25 S.Ct. 24, 49 L.Ed. 160; Board of Levee Commissioners v. Hulse, supra; Hunkin-Conkey Construction Co. v. Pennsylvania Turnpike Commission, supra.

John G. Fox was made a defendant to the complaint, both individually and as Attorney General of the State of West Virginia. He immediately filed a motion asking that he be dropped as a party defendant, on the grounds that no controversy was shown to exist between the plaintiff and himself; that the complaint shows on its face that he has no interest in the action; and that no relief is asked against him. His motion ws sustained. This created a somewhat peculiar situation, in that counsel for both Guaranty Trust Company of New York and West Virginia Turnpike Commission, the only parties left in the suit, took the same view and made similar arguments concerning the validity of the Commission's acts; that is, both parties seek to uphold the Commission's authority to proceed as it has done. With the dismissal of the Attorney General, there was left in the case no party whose interest it was to uphold the contrary view; i. e., that the Turnpike Commission was exceeding its powers. It was therefore suggested by the court that the Attorney General come into the case as *amicus curiae,* which would be permitted by the court in order to hear both sides of the argument. There is also, of course, Rule 24(b) of the Federal Rules of Civil Procedure, 28 U.S.C., authorizing the court to permit intervention of a governmental officer or agency in cases where there is reliance for ground of claim or defense upon any statute or executive order administered by such officer or agency. Instead of coming in either as *amicus curiae* or under 24(b) the Attorney General filed a motion in the name of the State of West Virginia for leave to intervene and to secure "affirmative relief" which is said, in an answer tendered with the motion, to consist of a declaration of "rights and legal relations existing between the parties" to this suit, and a like declaration that the plans of the Commission concerning the turnpike, the trust agreement, and the issuance of the revenue bonds are not in compliance with the Act.

I was doubtful whether the court could permit the State of West Virginia as such

to intervene, in view of the absolute prohibition concerning suits against the State of West Virginia contained in its constitution, and of the Eleventh Amendment to the federal constitution. However, in order to prevent delay of the hearing, I entered the order permitting intervention by the State and filing of the State's answer, with the understanding conveyed orally to counsel that the jurisdictional question would be further considered and passed upon.

Plaintiff then moved for a judgment on the pleadings. Argument was heard and briefs filed, both on the jurisdictional questions raised, and on the merits of the motion. The Attorney General appeared for the State and argued in support of the jurisdiction of the court to entertain the main suit and also to permit intervention by the State, and in opposition to plaintiff's motion for judgment; while counsel for the Trustee and the Commission sought to sustain the jurisdiction and plaintiff's motion as well. Counsel cite the cases of Clark v. Barnard, 108 U.S. 436, 2 S.Ct. 878, 27 L.Ed. 780 and Missouri v. Fiske, 290 U.S. 18, 54 S.Ct. 18, 78 L.Ed. 145, among others, in support of their contention that the State as such should be permitted to intervene. Doubtless these cases support the proposition that where a state seeks some affirmative relief it may intervene in a pending case in a federal court and assert a claim for such relief. They are not applicable here. It is strenuously contended by all counsel that the State should be a party to this suit in order, as is said in the brief of the Turnpike Commission that "any decree entered herein may be decisive and final for all purposes." The answer filed by the State prays for what is denominated "relief" as has already been stated. However, I am unable to perceive in what way any decree entered by the court in this action will affect the State of West Virginia or be decisive as to it, in view of my decision already expressed that the West Virginia Turnpike Commission is an entity separate and distinct from the State of West Virginia, and therefore any declaratory or affirmative decree in this case will affect it exclusively and not the State. To

hold otherwise would be to hold, in effect, that this suit originally was a suit against the State of West Virginia, and therefore not within the jurisdiction of the court. I have already said that it is not a suit against the State.

The State of West Virginia seeks no affirmative relief here. It merely asserts the negative of the proposition as to which plaintiff asserts the affirmative, namely, that the proceedings of the West Virginia Turnpike Commission were authorized by the Act.

The only possible interest of the State, so far as I can see, is that contemplated by the provisions of Rule 24(b); and this interest lies not in the State as such, but in the governmental officer or agency charged with administering a statute or executive order relied upon by a party as ground of claim or defense. The statute in question here is to be administered by the West Virginia Turnpike Commission itself; but the letter of the Governor directed to the Commission, whereby the Commission was requested to "get in compliance" with the provisions of the Act, which letter caused the Commission to bring its operations to a halt, may quite properly be said to be an executive order on which the Commission relies for its defense in this suit. It is therefore proper, I think, to permit the Attorney General to intervene, but not the State itself. As has already been seen, the Attorney General was made a party originally in his official capacity. Having been dismissed from the suit on his own motion, it is perhaps understandable that he did not then seek to intervene under Rule 24(b), since that procedure would have given rise to an apparent inconsistency in his position; but I believe I can properly treat the intervention already allowed in the name of the State as that which is provided for in Rule 24(b). To the extent allowed by that Rule, the Attorney General will be considered as an intervening party.

Proceeding now to deal with plaintiff's motion for judgment on the pleadings, the first step is to make a study of the turnpike statute. I must decide first whether the Commission was authorized by the Act to

build any type of turnpike which it might in its discretion see fit to build; or was limited to the construction of turnpikes with multiple lanes in each direction. If I conclude that the powers of the Commission are limited to the construction of turnpikes with multiple lanes in each direction, I must then consider whether the plan of construction for which the Commission provided was within that limitation.

I have already set out the applicable provisions of the turnpike statute. By a careful study of these provisions it is possible to synthesize them into a compact form whereby repetitions and surplusage are eliminated, and the essential words regrouped and defined so that they may be understood as they were meant to be understood in relation to one another. Such a process produces the following compact language:

> "In order to provide (among other results) for the construction of modern express (i. e., high speed) highways (i. e., main roads) embodying every known safety device, including multiple lanes in each direction, the Commission is authorized to construct and operate any express highway or turnpike (i. e., toll road) which it may determine to construct under the provisions of this act; and the Turnpike Commission is further authorized to issue revenue bonds at one time or from time to time, payable solely from revenues, for the purpose of paying all or any part of the cost of any one or more turnpike projects; and (at its discretion) to issue refunding bonds for the additional purpose of constructing enlargements of the (aforesaid) projects."

In the first place, it will be noted that the purpose of the Act, as stated in its title, is "to facilitate vehicular traffic in the state of West Virginia". This is also given in Section 1 as one of the results sought for in authorizing the construction of turnpike projects; the others being removal of present handicaps and hazards on congested highways, promoting agricultural and industrial development, and providing for constructing express highways embodying every known safety device.

In accordance with well established principles of statutory construction, the language which is the subject of our study must be interpreted and construed so as to give effect, if possible, to every part of the Act. State ex rel. Churchman v. Hall, 86 W.Va. 1, 102 S.E. 694; State v. Jackson, 120 W.Va. 521, 199 S.E. 876. The interpretation must be in keeping with the purpose of the Act, as expressed in its title; Metropolitan Life Ins. Co. v. Hill, 115 W. Va. 515, 177 S.E. 188; Newhart v. Pennybacker, 120 W.Va. 774, 200 S.E. 350, 754; and a liberal construction must be given to the language to accomplish that purpose, as required by Section 20 of the Act.

It is clear from the exhibits filed with the complaint, and there is no argument to the contrary, that the immediate construction of a four-lane highway could not be financed by revenue bonds, because of the high cost of construction through mountainous territory. It is equally clear and undenied that this situation will continue to exist throughout the foreseeable future. Therefore, unless the Act is so construed as to give the Commission discretion to build (at least initially) some type of turnpike other than a four-lane highway, the entire Act would be and remain a dead letter. The Attorney General argues that since, as he believes, the Commission's powers are limited by the Act to the construction of a four-lane highway, the only recourse is a legislative amendment broadening its powers. This would be true if the limitation were clearly expressed, so as to leave no room for doubt as to the intention of the Legislature; but where, as here, there exists an ambiguity, the purpose of the statute must be given effect if a reasonable construction of its language will permit.

In my opinion Section 1 of the Act merely lists certain results which are expected to be accomplished by the creation of a turnpike commission and its authorization to construct turnpikes. As merely one, among other results, it is expected by the Legislature that this Act will bring about

the construction of high-speed main roads which will be provided with every known safety device. Included among these safety devices (but by no means the only one) is the device of multiple lanes in each direction. Other devices, consisting of ample shoulder widths, long sight distances, by-passing of cities, and grade separations at intersections, are also pointed out; but of course, among the known safety devices for highways there are many others than those listed in Section 1. A comprehensive system of road markers and traffic signals; use of special materials to avoid slippery conditions in cold weather; provision of adequate lighting in tunnels; guard rails; regulation of maximum and minimum speeds to conform to particular conditions at different places on the highway; these are only a few of the better known devices that occur readily to a layman. Experienced construction engineers doubtless could name dozens of other safety devices not mentioned in Section 1.

■ It is contended that the safety devices listed in Section 1 must be held to constitute a minimum standard of construction. In fact, this contention is the entire substance of the Attorney General's argument, as set out in his opinion delivered to the Governor and in his argument in this court. The plain language does not admit of this construction. Clearly, by use of the word "including" the lawmakers intended merely to list examples of known safety devices, but not to exclude others equally well known. Had the latter been their intention, the proper expression to have been used would have been "comprising," "consisting of," or some synonomous term. This is not a situation which calls for the application of the maxim, *"expressio unius est exclusio alterius."*

Moreover, the interpretation of the Act so as to impose upon the power of the Commission the limitation which the Attorney General has held was imposed would involve a strained grammatical construction. The Commission is authorized to construct and operate any express highway or turnpike which it may "determine to construct under the provisions of this act". By the Attorney General's interpretation

the phrase "under the provisions of this act" would be an adjective phrase modifying "turnpike projects," and meaning that the projects to be constructed are such only as are described in the Act. It is clear to me that this is not an adjective phrase, but an adverbial phrase modifying the verbal phrase "determine to construct". In other words, the statute sets out in great detail the manner in which the Commission shall act in making decisions as to the location of turnpike projects, the employment of engineers and others to carry out the construction work, the issuance of revenue bonds, and many other incidental activities in connection with the construction of turnpikes. The Legislature merely intended by this language to convey the meaning that turnpike projects are those which are *constructed* under the provisions of the Act relating to *construction* thereof. It is not here attempting to define a turnpike project by reference to other provisions of the Act. The language itself, as set out in Section 4(b), *is* the definition. It is so referred to in Section 1, which uses the word "hereinafter" and it is so referred to in Section 5(e), which uses the word "hereinabove." It is clear to me that if the intention had been to include in the definition of a turnpike project every known safety device in road construction, including those listed, the Legislature, instead of saying in Section 1 that the Commission was authorized to construct turnpike projects "as hereinafter defined" would have said "as hereinabove and hereinafter defined;" or that in setting out the definition of turnpike projects in Section 4(b), it would have expressly included those safety devices as limitations upon the type of such projects.

■ A correct interpretation, therefore, of the Turnpike Act is that it gives to the Commission a sound discretion in carrying out the prime purpose of the Act; "to facilitate vehicular traffic in the state of West Virginia". If the Commission should find that immediate construction of a four-lane turnpike could be financed by revenue bonds, then the financing and building of an inferior type of roadway might well be deemed an abuse of that discretion. It might be logically argued in such case that

the requirements of the Act would not be fulfilled by constructing either a turnpike intended to function permanently as a two-lane highway, or one which, consisting at first of only two lanes, is to be later widened and made into one of four lanes. On the other hand, if the Commission should find that a four-lane turnpike could *never* be financed by revenue bonds, then doubtless its discretion would be soundly exercised in building any turnpike which *could* be financed and which would embody as many safety features as could be provided without endangering the financing itself, even though these might not include any provision for further and multiple lanes.

In short, the Commission was authorized to construct, in the exercise of a sound discretion, whatever projects it might deem fit and proper in order to accomplish the purpose of the Act; that is, "to facilitate vchicular traffic," and to produce, as far as might be reasonably possible, the kind of turnpike envisioned in Section 1 of the Act.

Even if I should be wrong in the foregoing reasoning; even if the Commission has no discretion under any circumstances to build a two-lane turnpike, with no provision for enlargement into multiple lanes; yet, it does not follow that the Commission has here acted beyond its powers. It *has* provided for a four-lane turnpike. It has decided that such a project cannot be financed at once; but it has further concluded, from the best expert advice obtainable, that it can be financed in stages. Therefore, it has determined to embark upon a project which, while consisting at first of only two lanes, is to evolve by stages into a four-lane turnpike.

The Attorney General recognizes in his opinion the legality of a stage by stage plan of construction. He condemns the present plan because he says there is no certainty that it will ever materialize as a four-lane highway.

Naturally, the final result of building by stages can never be predicted with absolute certainty Economic changes; unforeseen engineering difficulties; international crises; these and many other contingencies may conceivably prevent entirely or postpone indefinitely the accomplishment of plans whose fulfillment at first appears definite and certain. "The best-laid schemes o' mice an' men gang aft agley." If certainty of fulfillment of a plan to build in stages a four-lane highway be required by the Act, it can be no more than a reasonable certainty. The exhibits filed with the pleadings demonstrate with reasonable certainty that the building and financing of the turnpike in the projected stages will result in a four-lane highway being finished and in use within a few years, the maximum period of transformation being estimated to be fifteen years. They demonstrate with like certainty that unless construction and financing by stages is undertaken, no four-lane turnpike can be built at all.

The Legislature intended that turnpikes should be built. The Commission has determined to carry out this intention by the only means available to it. I am of opinion that its plan conforms even to the strict interpretation of the Act expressed in the Attorney General's opinion.

The Act itself contemplates the construction of turnpikes in stages. It provides that bonds may be authorized and issued at one time or from time to time for the payment of any part of the cost of any project. Obviously, no part of a project can be built at any one time which has not then been financed. The only money that can be used is that which is raised by revenue bonds issued and sold for that part of the project. It is equally obvious that there could be no market for a bond issue to raise funds for the construction of part of a project unless that part is to be put into use as soon as completed. Tolls are the only source of revenue with which to pay the bonds. The clear intention of the Legislature, as gathered from the entire Act, is that the Commission be empowered to proceed as it has proceeded.

Plaintiff's motion for judgment on the pleadings will be granted.

It is the judgment of the court that the proceedings of the West Virginia Turnpike Commission, as set forth in the pleadings and exhibits, are in all respects in conformity with the Turnpike Act; and that

therefore plaintiff has the legal right to compel the Commission to go ahead with the work of building the turnpike according to the terms of the trust agreement. To obviate the necessity of further litigation to enforce the right above declared, plaintiff will be awarded the compulsory process of this court, if such be necessary, to enforce compliance with the declaratory judgment.

An order to this effect will be entered.